[No. B183741. Second Dist., Div. Eight. Feb. 27, 2006.]

ROBERT STAMPS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
KENNY-SHEA-TRAYLOR-FRONTIER-KEMPER, JV, et al., Real Parties
in Interest.

**COUNSEL**

McNicholas & McNicholas, Patrick McNicholas, Tae Kim and Holly N. Boyer for Petitioner.

No appearance for Respondent.

McKenna Long & Aldridge, Stephanie B. McNutt, Margaret I. Johnson and Joseph L. Greenslade for Real Parties in Interest.

Opinion

RUBIN, J.—

## INTRODUCTION

The issue presented in this petition for writ of mandate is whether a violation of statutory protections against discriminatory violence and intimidation and against denial of civil rights by means of threats ·and intimidation (Civ. Code, §§ 51.7, 52.1) may be asserted as a separate cause of action in an action alleging wrongful termination and employment discrimination.[1] The trial court ruled these sections were part of the Unruh Civil Rights Act (the Act) and, thus, were inapplicable in the employment context. We conclude there is no bar to asserting violations of sections 51.7 and 52.1 in employment cases. Accordingly, we reverse the trial court's order sustaining real parties in interest's demurrer and granting their motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Kenny-Shea-Traylor-Frontier-Kemper, JV, and Traylor Bros., Inc. (collectively Traylor), is a mining company that employed petitioner Robert Stamps as a tunnel miner. Stamps sued Traylor and his supervisor, Travis Thompson, alleging he was subjected to retaliation, violence, and intimidation by threat of violence. Stamps, an African-American, further alleged Thompson verbally harassed him with racist remarks, yelled at him in an intimidating manner, threatened him with physical violence for not completing work assignments, and generally placed him in unsafe work situations without proper equipment and training, all on account of his race. Thompson's alleged lack of concern for Stamps's safety resulted in an injury that caused several of Stamps's toes to be amputated. Stamps was terminated as a result of his injury.

The operative pleading was the first amended complaint, which alleged three causes of action: (1) wrongful termination in violation of public policy, (2) retaliation in violation of public policy, and (3) violation of sections 51.7 and 52.1. Traylor and Thompson (collectively real parties) demurred and filed a motion to strike. Among their contentions, real parties argued the third cause of action failed because sections 51.7 and 52.1 are part of the Act and the Supreme Court held in *Rojo v. Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373] (*Rojo*), that the Act does not apply to employment cases.

The trial court agreed with real parties and sustained the demurrer to the third cause of action without leave to amend. The court also struck Stamps's

---

[1] All unspecified code references are to the Civil Code.

[2] Because we are reviewing a demurrer and motion to strike, the factual recitation comes primarily from the complaint.

request for attorney fees and penalties under sections 51.7 and 52.1. On Stamps's petition, we issued an alternative writ of mandate and heard oral argument. As we will discuss, we hold Stamps properly stated a cause of action; the trial court, therefore, erred in its rulings.[3]

We organize our opinion by first providing an overview of the applicable legislation and its history. We then conclude that sections 51.7 and 52.1 are not part of the Act, the Supreme Court in *Rojo* did not adopt a rule barring employment cases from being founded on the two statutes, and there is no other reason to preclude such statutory claims in employment cases.

## DISCUSSION

### 1. *Standard of Review*

"As the issues presented are all entirely legal in nature, we employ our independent judgment. [Citations.]" (*Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 753 [120 Cal.Rptr.2d 550] (*Gatto*).)

### 2. *The Legislative Framework of Relevant Civil Code Sections*

■ *A. Sections 51.7 and 52.1: Overview.* Section 51.7 broadly provides that all persons have the right to be free from violence and intimidation by threat of violence based on, among other things, race, religion, ancestry, national origin, political affiliation, sex, or position in a labor dispute.[4] The rights protected by section 51.7 may be enforced by a private action for damages. (See § 52, subd. (b).)[5] Section 52.1 allows a civil action for damages

---

[3] The trial court sustained real parties' demurrer to the second cause of action as well, but Stamps asserts no error as to that part of the order. The trial court overruled the demurrer to the first cause of action.

[4] The version of section 51.7 relevant here states in part, "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive." The 2005 amendments to the code do not affect our analysis.

[5] Section 52, subdivision (b) states, in relevant part, "Whoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following: [¶] (1) An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages. [¶] (2) A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, or by the Attorney General, a district attorney, or a city attorney. An action for that penalty brought pursuant to Section 51.7 shall be commenced within three years of the alleged practice."

and equitable relief for interference, by threats, intimidation or coercion, with the exercise of constitutional or other rights provided by law. The section also provides criminal sanctions for violations.[6] Attorney fees may be awarded under both statutes. (§§ 52, subd. (b)(3), 52.1, subd. (h).)

*B. Sections 51.7 and 52.1: Legislative History.* The history of section 51.7 indicates the legislation was referred to as the Ralph Civil Rights Act and enacted in 1976 as part of Assembly Bill No. 2986 (1975–1976 Reg. Sess.) (Assembly Bill No. 2986). An Assembly Committee report stated that while there were "numerous state and federal laws providing for full and equal civil rights protections in employment, housing, and access to public accommodations and facilities," there was no specific prohibition protecting individuals from "violence because of their race, religion, color, ancestry, or national origin." (Assem. Com. on Labor Relations, Analysis of Assem. Bill No. 2986, *supra*, Apr. 20, 1976, p. 1.) The report continues, "Although it is impossible to estimate the instances of violence against persons in California because of race, color, religion or other factors, there have been enough occurrences such as the one in Taft, California last year where Black college students were threatened with violence and chased out of town to signify a possible need for greater protection of this fundamental right. . . . This measure declares that all persons have a right to be free from violence or threat of violence committed against their persons or property because of race, color, religion, ancestry, national origin, political affiliation, or position in a labor dispute." (*Ibid.*; see also *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 845–848 [11 Cal.Rptr.3d 692, 87 P.3d 1] (*Venegas*) (conc. opn. of Baxter, J.), [describing the historical background of the "Ralph Civil Rights Act"]; *In re Joshua H.* (1993) 13 Cal.App.4th 1734, 1748, fn. 9 [17 Cal.Rptr.2d 291] [referring to section 51.7 as the "Ralph Civil Rights Act"].)

---

[6] Section 52.1 provides, in relevant part, "(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. An action brought by the Attorney General, any district attorney, or any city attorney may also seek a civil penalty of twenty-five thousand dollars ($25,000). . . . [¶] . . . [¶] (b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured. . . . [¶] . . . [¶] (g) An action brought pursuant to this section is independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law, including, but not limited to, an action, remedy, or procedure brought pursuant to Section 51.7."

As noted by an Assembly committee report, a central feature of section 51.7 was to afford an individual the opportunity to file immediately a private civil action at the same time he or she pursued a complaint with the Fair Employment Practices Commission (FEPC). (Assem. Com. on Labor Relations, Analysis of Assem. Bill No. 2986, *supra*, Apr. 6, 1976, p. 1.) Previously, a person filing a complaint with the FEPC would have been precluded from concurrently initiating a private civil action on the same matter. Assembly Bill No. 2986 allowed for both a private civil remedy and the enforcement mechanisms of the FEPC. (*Ibid.*; Assem. Office of Research, Analysis of Assem. Bill No. 2986, *supra*, as amended Aug. 16, 1976; Legis. Analyst, Analysis of Assem. Bill No. 2986, *supra*, as amended Apr. 30, 1976, p. 2; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2986, *supra*, as amended May 25, 1976, p. 2.)

The second statute on which Stamps's third cause of action was based, section 52.1, was enacted a decade later as part of Assembly Bill No. 63 (1987–1988 Reg. Sess.) (Assembly Bill No. 63) and is known as the Tom Bane Civil Rights Act. It was intended to supplement the Ralph Civil Rights Act as an additional legislative effort to deter violence. (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 63, *supra*, as amended Mar. 2, 1987, p. 1.) The stated purpose of the bill was "to fill in the gaps left by the Ralph Act" by allowing an individual to seek relief to prevent the violence from occurring before it was committed and providing for the filing of criminal charges. (Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 63, *supra*, as amended Apr. 6, 1987, p. 2.)

The Assembly Committee on Public Safety reported, "The Attorney General's office states that the number of crimes which are committed because of the victim's racial, ethnic, religious, or other minority status are increasing, that members of minority groups increasingly believe they are threatened by attack or harassment, and that existing law is inadequate to protect them. They also stated that existing civil rights statutes do little to deter hate violence because there are no criminal penalties. Existing criminal statutes (trespass, vandalism, etc.) do not reflect the seriousness of the problem of racially motivated violence. The purpose of this bill is to give law enforcement officials clear effective authority to prevent acts of hate violence, and to deter such conduct by establishing serious criminal penalties" and by "[a]llow[ing] an individual, or the Attorney General, district attorney, or city attorney, to bring an action to enjoin crimes of hate violence where they are threatened." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 63, *supra*, as amended Mar. 2, 1987, pp. 1–2; see also *Venegas, supra*, 32 Cal.4th at pp. 845–848 (conc. opn. of Baxter, J.) [describing the historical background of the Tom Bane Civil Rights Act]; *In re Joshua H., supra*, 13 Cal.App.4th at pp. 1739, 1748, fn. 9 [referring to section 52.1 and

Penal Code section 422.7 as the "Tom Bane Civil Rights Act," and stating that, along with the Ralph Civil Rights Act and related statutes, it is California's response to the increase in hate crimes]; *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 110 [80 Cal.Rptr.2d 60] [section 52.1 part of Tom Bane Civil Rights Act].)

The legislative history reveals that the broad and plain language of sections 51.7 and 52.1 was chosen to provide protection from discriminatory violence and intimidation, and from threats, intimidation and coercion that denied the civil rights of others. The creation of civil causes of action by victims of such conduct was at the heart of the legislation. Neither the words of the statutes nor their lineage reflects an explicit intent by the Legislature either to include or exclude sections 51.7 and 52.1 from the realm of the Act.

*C. The Act.* Section 51 provides in relevant part, "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, [or] medical condition . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).) The statute's prefatory clause states "This *section* shall be known, and may be cited, as the Unruh Civil Rights Act." (§ 51, subd. (a), italics added.) The act traces its origins to similar legislation enacted in 1901 and again in 1905. (See Historical Note, 6 West's Annot. Civ. Code (1982 ed.) foll. § 51, p. 312.) Its purpose is "to compel recognition of the equality of all persons in the right to the particular service offered by an organization or entity covered by the act." (*Curran v. Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 733 [195 Cal.Rptr. 325]; see also *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 738 [180 Cal.Rptr. 496, 640 P.2d 115].) As part of the 1959 amendments, it was named after California's former Speaker of the House, Jesse Unruh.[7]

Although the breadth of the Act is wide, its mission explicit, and is to be liberally construed (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28 [219 Cal.Rptr. 133, 707 P.2d 195]), our Supreme Court has stated that the Act "has no application to employment discrimination." (*Rojo, supra,* 52 Cal.3d at

---

[7] The short title, The Unruh Civil Rights Act, is in the codified version of the legislation. (§ 51.) The uncodified version of section 51.7 provides: "This act shall be known, and may be cited, as The Ralph Civil Rights Act of 1976." (Stats. 1976, ch. 1293, § 1, p. 5778.) The uncodified version of section 52.1 provides: "This act shall be known and may be cited as the Tom Bane Civil Rights Act." (Stats. 1987, ch. 1277, § 1, p. 4544.) As the Act was named after its author, the former speaker, the two later acts were named after their authors, Assemblymen Leon Ralph and Tom Bane, respectively. (Assem. Bill No. 2986, *supra,* as introduced Feb. 4, 1976; Assem. Com. on Public Safety, Rep. on Assem. Bill No. 63, *supra,* Mar. 23, 1987.) We find no legal significance in the fact that section 51's short title found its way into the Civil Code, but the colloquial names of sections 51.7 and 52.1 remain uncodified.

p. 77; see also *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 500 [86 Cal.Rptr. 88, 468 P.2d 216] (*Alcorn*).) In *Alcorn*, an employment discrimination case, the Supreme Court concluded that, notwithstanding the statute's extensive reach, "there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." (*Alcorn*, at p. 500; see also *Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 83, fn. 12 [219 Cal.Rptr. 150, 707 P.2d 212] ["employer-employee relationship" is not covered by the Act].)

### 3. *Interplay Among the Act and the Ralph and Tom Bane Civil Rights Acts*

In their opposition to the petition for extraordinary writ, real parties state their principal argument in words that could not be clearer: "Civil Code sections 51.7 and 52.1 are part of the Unruh Civil Rights Act, Civil Code sections 51 et seq." From this proposition, real parties argue that since the two statutes in question are part of the Act and since *Rojo* holds the Act does not apply to employment cases, it flows that Stamps cannot base his third cause of action on sections 51.7 and 52.1.

We find two flaws in this argument. First, neither legislative history nor case law supports the conclusion that sections 51.7 and 52.1 are included in what is known as the Act. Second, even if the Act's reach did extend to these two statutes, there is nothing in *Rojo* that suggests the Supreme Court intended to preclude employment cases from being founded on sections 51.7 and 52.1 even if they may not be predicated on section 51.

*A. The Act does not include the Ralph or Tom Bane Civil Rights Acts.* The parties vigorously debate whether the sections under consideration are or are not part of the Act. Before we reach our destination, we gently observe a point that is beyond controversy: The courts generally have done a poor job of describing the various components of the Act. Not until 2002 did an appellate court tackle the issue head on. In *Gatto, supra,* 98 Cal.App.4th 744, the court was confronted with determining the statute of limitations for actions under sections 51 and 51.7. The case had nothing to do with employment discrimination; rather, a Hell's Angel was ejected from a county fair for not removing his motorcycle club vest. The court refused to assume that the statutes of limitations for the two sections were necessarily the same.[8] Instead, it initially reflected on the lack of precision in describing the components of the Act.

---

[8] Courts have wrestled with the proper statute of limitations for a claim under section 51 et seq.: is it one year on the theory that the claim is essentially a common law action founded on neglect (Code Civ. Proc., § 340) or three years based on a statutory cause of action (Code Civ. Proc., § 338, subd. (a))? (See *Gatto, supra,* 98 Cal.App.4th at pp. 754–755, and cases cited; *West Shield Investigations & Security Consultants v. Superior Court* (2000) 82 Cal.App.4th 935, 951–954 [98 Cal.Rptr.2d 612] (*West Shield*).)

■ "By its own terms, the Unruh Civil Rights Act comprises *only* section 51. Subdivision (a) of section 51 states: 'This *section* shall be known, and may be cited, as the Unruh Civil Rights Act.' (Italics added.) The courts, however, have consistently described as Unruh Civil Rights Act claims causes of action based under seemingly related provisions set forth in sections of the Civil Code that follow section 51. *West Shield* is a good example. That case presented no claim of denial of full and equal accommodations in violation of section 51; however, the court treated causes of action alleging interference with the exercise of constitutional rights under section 52.1, and sexual harassment under section 51.9 as Unruh Civil Rights Act claims. Similarly, section 51.9 was treated as an 'Unruh Civil Rights Act claim' in *Brown v. Smith* (1997) 55 Cal.App.4th 767, 774–775 [64 Cal.Rptr.2d 301], as was section 54.1 in *Independent Housing Services* [(1993)] 840 F.Supp. 1328. Citing several state and federal opinions, the court in *Doe v. Petaluma City School Dist.* (N.D.Cal. 1993) 830 F.Supp. 1560 stated that '[i]t appears that section 52.1 is at least a "component" of the Unruh Civil Rights Act.' (*Id.* at p. 1581.) It is noteworthy, however, that in construing section 52.1, our Supreme Court explained that it was enacted by the Legislature 'to stem a tide of hate crimes' (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338 [70 Cal.Rptr.2d 844, 949 P.2d 941]) and never referred to it as part of the Unruh Civil Rights Act which, at least originally, dealt only with the issue of equal accommodations. Other courts have referred to section 52.1 and related statutes, including section 51.7, as part of the Bane Act. (See, e.g., *Bay Area Rapid Transit Dist. v. Superior Court* (1995) 38 Cal.App.4th 141, 144 [44 Cal.Rptr.2d 887]; *Boccato v. City of Hermosa Beach* (1994) 29 Cal.App.4th 1797, 1809 [35 Cal.Rptr.2d 282].) *In re Joshua H.* (1993) 13 Cal.App.4th 1734 [17 Cal.Rptr.2d 291] also refers to section 52.1 as part of the Bane Act but refers to section 51.7 as the 'Ralph Civil Rights Act.' (*Boccato*, at p. 1748, fn. 9.) [¶] Reference to a statute or statutory scheme by the name of its author does not influence the meaning and effect of the enactment, but an erroneous denotation that includes one measure as part of another may obscure differences that are legally very significant. This is what appears to have happened to the Unruh Civil Rights Act, which is increasingly treated as an omnibus antidiscrimination statute no longer limited to merely ensuring equal access to accommodations. For purposes of determining the applicable statute of limitations, this creates a problem, for the provisions now seen as parts of the Unruh Civil Rights Act do not all share the same common law provenance." (*Gatto, supra,* 98 Cal.App.4th 744, 757–758.)[9]

---

[9] We observe that the confusion over the scope of the Unruh Civil Rights Act is not limited to the judiciary. It exists in at least one other statute. Insurance Code section 1861.03, subdivision (a) provides: "The business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited to, the Unruh Civil Rights Act (Sections 51 to 53, inclusive, of the Civil Code), and the antitrust and unfair business practices laws (Parts 2

▪ Although the *Gatto* court does not unequivocally hold that sections 51.7 and 52.1 are not part of the Act, we are not so reserved: We conclude neither section is part of a properly denominated Act.[10] This conclusion is based largely on the legislative history that we have described *ante* and is consistent with that reached by two commentators in the civil rights litigation field. Their treatise devotes entire sections to two subjects: "Ralph Act is not part of the Unruh Act or FEHA," and "Bane Act is not part of the Unruh Act, the Ralph Act or another statute." (Kahn & Links, Cal. Civil Practice: Civil Rights Litigation (2005) § 314, p. 27, § 327, p. 50.)[11]

---

(commencing with Section 16600) and 3 (commencing with Section 17500) of Division 7 of the Business and Professions Code)." Real parties assert that the Legislature has recognized that all sections from 51 to 53 of the Civil Code (including sections 51.7 and 52.1) are part of the Act.

Insurance Code section 1861.03 was not originally enacted by the Legislature but by initiative as part of Proposition 103. The initiative effected wide-ranging changes on the writing of insurance in California. It froze rates, gave the Insurance Commissioner ratemaking power, required insurers to provide good driver discounts, and subjected the insurance industry to antidiscrimination, antitrust and unfair business practice laws that were applicable to other businesses. (See *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 978–982 [11 Cal.Rptr.3d 45].) The ballot pamphlet—which is a proper aide in interpretation of a voter initiative (see *In re Littlefield* (1993) 5 Cal.4th 122, 130 [19 Cal.Rptr.2d 248, 851 P.2d 42]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 740, fn. 14 [248 Cal.Rptr. 115, 755 P.2d 299])—makes no mention of the Act, but refers to prohibiting "discrimination, price-fixing and unfair practices by insurance companies" (Ballot Pamp., Gen. Elec. (Nov. 8, 1988 Official Title and Summary of Prop. 103 by Atty. Gen., p. 98.) and generally to "antimonopoly" and "antitrust" laws. (See Ballot Pamp., *supra*, analysis of Prop. 103 by Legislative Analyst, pp. 98, 140; *id.*, argument in favor of Prop. 103, p. 100.)

Although we do not blithely ignore statutory language, we are not persuaded that Insurance Code section 1861.03 has any bearing on our analysis. "It is not the duty of courts, by a blind adherence to the letter of the law, to perpetuate mistakes inadvertently made by the lawmaker." (*Southern Pacific Co. v. Riverside* (1939) 35 Cal.App.2d 380, 388 [95 P.2d 688].) Considering that the voters chose the initiative language in order to subject insurance companies to Civil Code sections 51 to 53 and other consumer laws, and not to delineate what statutes should be considered within the scope of the Unruh Civil Rights Act, we conclude the broad reference to the Act reflected the same sort of confusion the *Gatto* court identified in judicial opinions.

[10] At least one state and one federal court have agreed with the limited extent of the Act. (See *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 395 [19 Cal.Rptr.3d 29] (*Alch*) ["In fact, the Act consists of only Civil Code section 51 . . . ."]; *Goldman v. Standard Ins. Co.* (9th Cir. 2003) 341 F.3d 1023, 1027, fn. 4 ["To avoid any confusion, all references to the Unruh Act in this opinion mean California Civil Code section 51"], see also Cal. Dept. Fair Employment & Housing, general information about the Act, at <http://www.dfeh.ca.gov/Publications/DFEH%20250.pdf> [as of Feb. 27, 2006] [explaining the Act is codified at §§ 51–51.2]; general information about the Ralph Civil Rights Act at <http://www.dfeh.ca.gov/Publications/DFEH%20187.pdf> [as of Feb. 27, 2006] [citing Ralph Act as section 51.7; "Unlawful Discrimination, Your Rights and Remedies, Civil Rights Handbook," California Attorney General's Office (2d ed. 1990), chs. I, III, IV [treating Ralph & Tom Bane Civil Rights Acts separate from the Act].)

[11] Chapter 2 of the first volume of the text is devoted to the Act; chapter 3 deals with the Ralph and Tom Bane Civil Rights Acts. (Kahn & Links, Cal. Civil Practice: Civil Rights Litigation, *supra*, § 314, p. 27, § 327, p. 50.)

The authors observe that several cases "have erroneously referred to the Ralph Act as the Unruh Act. [Citations.] . . . Although the Ralph Act and the Unruh Act are codified near each other in the Civ. Code, and both share the same remedy statute, Civ. Code, § 52, there are significant differences between them. The Ralph Act focuses on violence or intimidation by threat of violence, while those concepts are absent in the Unruh Act. The Unruh Act, Civ. Code, § 51, is a public accommodations statue that focuses on discriminatory behavior by business establishments, while the Ralph Act has nothing to do with public accommodations or business establishments." (Kahn & Links, Cal. Civil Practice: Civil Rights Litigation, *supra*, § 314, p. 28.) Similarly, many "cases have referred to a Bane Act claim as an Unruh Act claim and/or stated that the Bane Act is a component of the Unruh Act." (*Id.*, § 327, at p. 51.) This, the authors assert, is "erroneous." (*Ibid.*) We agree.[12]

*B. Real parties' authorities are not persuasive.* The cases on which real parties rely to support their argument that section 51.7 and 52.1 are part of the Act do not so hold. As *Gatto* observes, those cases generally reflect a "lack of clarity as to which provisions of [the Civil Code] actually comprise the Unruh Civil Rights Act . . . ." (*Gatto, supra*, 98 Cal.App.4th at p. 759.) For the most part, these authorities do not even discuss sections 51.7 or 52.1 and had no cause to decide what provisions actually comprise the Act.

For example, in *Los Angeles County Metropolitan Transportation Authority v. Superior Court* (2004) 123 Cal.App.4th 261 [20 Cal.Rptr.3d 92], the court was confronted with whether Government Code section 818 prohibiting punitive damages against public entities applied to section 52, subdivision (b)(2) which allows for a $25,000 civil penalty.[13] The Court of Appeal framed the case thusly: "In this writ proceeding, we are asked to address the novel question of whether section 818 precludes the award of the civil penalty specified in the Unruh Civil Rights Act (Civ. Code, § 51 et seq. [Unruh Act]) for the violation of certain of its provisions." (*Los Angeles County Metropolitan Transportation Authority v. Superior Court, supra*, at p. 264.) Neither in its prefatory statement nor in connection with the several other occasions where it used the term "Unruh Act" did the court have occasion to consider whether sections 51.7 or 52.1 were part of the Act. That determination was not germane to the issue of whether the California Tort Claims Act forbade the civil penalty from being imposed against the municipal defendant. If the court had eliminated all references to "the Unruh Act" and

---

[12] The Tom Bane Civil Rights Act expressly states it is "independent" of any action under section 51.7 (§ 52.1, subd (g).) Semantically, it is difficult for something to be "independent" of itself. Although we conclude that certain statutes following section 51 are not part of the Act, we recognize that the various provisions do reflect some common policies and that under appropriate circumstances these statutes may have bearing on the others.

[13] The civil penalty in section 52, subdivision (b)(2) applies to actions under section 51.7. Section 52.1 has its own civil penalty of $25,000. (See fns. 4 & 5, *ante*.)

instead had identified the statutes only by their code section, its analysis would have been intact. (See also *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1089 [6 Cal.Rptr.3d 457, 79 P.3d 569] (*Schifando*) [referring to the Act as "Civ. Code, § 51.7 et seq."]; *MaJor v. Miraverde Homeowners Assn.* (1992) 7 Cal.App.4th 618, 622 [9 Cal.Rptr.2d 237] ["Unruh Civil Rights Act. (Civ. Code, section 51 et seq.)"]; *Schmidt v. Superior Court* (1989) 48 Cal.3d 370, 374, 383–387 [256 Cal.Rptr. 750, 769 P.2d 932] [the Act as "section 51 et seq.," but only addressing section 51.2 and section 51.3 dealing with age discrimination in housing].)

In *Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 512–513 [38 Cal.Rptr.2d 489], the appellate court was also presented with the relationship between the Civil Code and the Tort Claims Act. There the precise issue was whether the Government Code section that precluded civil lawsuits for failure to provide police protection applied to claims under sections 51.7 and 52. The court answered the question affirmatively. (*Gates, supra,* at pp. 512–513.) As was the case in *Los Angeles County Metropolitan Transportation Authority v. Superior Court*, the court of appeal made repeated references to "the Unruh Act." But again, whether or not individual code sections were or were not part of the Act had no bearing on its analysis.

Finally, references to the "Unruh Act" are found in *West Shield, supra,* 82 Cal.App.4th at pages 951–954, in the same context as the other appellate decisions cited *ante*. The issue there was whether a one-year (personal injuries) or three-year (liability founded on a statute) statute of limitations applied to claims under sections 51.9 and 52.1.[14] In concluding that the one-year statute applied, the Court of Appeal noted that what it called the various Unruh Act statutes were all rooted in the common law and hence did not qualify for the longer limitations period. Again, the analysis did not turn on whether a particular statute was or was not properly included in the legislative short title.[15]

■ Real parties also rely on several federal cases that discuss the relationship of the various statutes starting with section 51. *McCalden v. California Library Ass'n* (9th Cir. 1990) 955 F.2d 1214, 1220–1221, is arguably the most helpful to their position. There, a "Holocaust revisionist" brought suit in federal court. He included a claim under section 51.7, in which he claimed intimidation because of his political beliefs. The

---

[14] Section 51.9, not applicable in the present litigation, deals with sexual harassment where there exists a "business, service, or professional relationship" between the parties.

[15] The *Gatto* court described the analysis in *West Shield* as "incomplete and misleading," and concluded that for statute of limitations purposes the statutes found in section 51 et seq. cannot be analyzed as if they were all part of one law. (*Gatto, supra,* 98 Cal.App.4th at pp. 756–757.)

Ninth Circuit assumed that section 51.7 was part of the Act, stating: "The California courts, however, have considered § 51.7 to be a 'component' of the earlier-enacted Unruh Civil Rights Act, Cal. Civ. Code § 51. See *Long v. Valentino*, 216 Cal.App.3d 1287, 1293 [265 Cal.Rptr. 96] (1989)." (*McCalden*, at pp. 1220–1221.)[16] *McCalden* does use section 51 authority to support its conclusion that the various categories enumerated in section 51.7 (e.g., race, national origin) are not exclusive and the protected classes include membership in political groups. (*McCalden*, at p. 1222.) Again, however, there is no effort to analyze how section 51.7 is or is not part of the Act. The fact that closely related statutes may be used to assist in statutory interpretation does not mean that one is included in the other. Rather, *McCalden*'s approach was an application of a venerable method of statutory construction. (See *Hicks v. E.T. Legg Associates* (2001) 89 Cal.App.4th 496, 505 [108 Cal.Rptr.2d 10] [" 'a statute is not to be read in isolation; it must be construed with related statutes and considered in the context of the statutory framework as a whole' "].) Unquestionably, sections 51.7 and 52.1 are related to the Act.

*Waters v. U.S.* (N.D.Cal. 1993) 812 F.Supp. 166, 169, also cited by real parties, involved a section 51.7 action in the employment context, the setting present here. However, the court dismissed the case without a discussion of the merits of the controversy, as the plaintiff had failed to exhaust her administrative remedies.

Remarkably, real parties also direct our attention to *Taormina v. California Dept. of Corrections* (S.D.Cal. 1996) 946 F.Supp. 829, 833–834 (*Taormina*). *Taormina* involves a federal civil rights action against a state correctional facility over an injury to an inmate. The opinion addresses pendent state claims which appear to be based primarily on sections 51, 51.5 (arbitrary discrimination in business establishments), and 51.7. (946 F.Supp. at p. 833.) The court described the plaintiff's complaint as follows: "Plaintiff's fifth cause of action (interference with statutory and constitutional rights) is premised on the Banes [*sic*] Act, Cal.Civ.Code section 51 et seq. . . ." (*Ibid.*) In omitting reference to the "Unruh Act," the opinion not only misidentifies section 51, it does so by misspelling the name of the author of section 52.1.[17]

---

[16] The citation to *Long v. Valentino* (1989) 216 Cal.App.3d 1287 [265 Cal.Rptr. 96], is not particularly helpful; *Long* is the type of case criticized in *Gatto*, as it assumed without analysis that the Act extends to the several sequentially numbered sections. More fundamentally, although section 51.7 is mentioned in the opinion, *Long* is more accurately analyzed as a typical section 51 case of denial of public accommodations—there, a public conference—based on an arbitrary group classification.

[17] Section 52.1 was not involved in *Taormina*, although section 51.7 was. As noted *ante*, the Tom Bane Civil Rights Act refers to section 52.1, the Ralph Civil Rights Act of 1976 to section 51.7. (See fn. 7 & text, pt. 2.B., *ante*.) *Taormina*'s incorrect use of the "Banes Act" seems to be derived from an earlier opinion of the court in *Gaston v. Colio* (S.D.Cal. 1995) 883 F.Supp. 508, 510 ["[a] recent California state court has held that § 52.1 must be read in conjunction with the

*C. Rojo does not address whether employment discrimination cases may be based on sections 51.7 or 52.1.* Real parties' central assertion is that the Supreme Court case of *Rojo, supra,* 52 Cal.3d 65, compels the ruling of the trial court. Their argument is founded on (1) the assumption that sections 51.7 and 52.1 are part of the Act, and (2) *Rojo*'s statement that "the Unruh Civil Rights Act has no application to employment discrimination." (52 Cal.3d at p. 77; see also *id.* at p. 74.) As we have already discussed, sections 51.7 and 52.1 are not part of the Act, thus kicking out the underpinnings of real parties' contention. More fundamentally, *Rojo* has nothing to do with the statutes involved in this case.

The issues articulated by the Supreme Court in *Rojo* were whether the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) "provides the exclusive remedy for injuries relating to sex discrimination in employment; whether an employee must exhaust the administrative remedies under the FEHA as a prerequisite to pursuing a civil action; and whether sex discrimination in employment may give rise to a claim of wrongful discharge in contravention of public policy." (*Rojo, supra,* 52 Cal.3d at p. 70.) These subjects are not present here.

As to the code sections that comprise the Act, the Supreme Court mentioned the statute by name five times. Twice, it was with specific reference to section 51 (*Rojo, supra,* 52 Cal.3d at pp. 76, fn. 5, 77); twice to both sections 51 and 52 (52 Cal.3d at p. 78); and once without reference to any code section at all (*id.* at p. 79). Concerning the language seized upon by real parties in support of their position here, the Supreme Court expressly referred to section 51: "No specific mention was made of Civil Code section 51, because none was needed: the Unruh Civil Rights Act has no application to employment discrimination." (52 Cal.3d at p. 77.)[18]

*Rojo* stands for the proposition that violations of section 51 may not be asserted in the employment context. This rule is consistent with Supreme

---

rest of the Bane Act"]. The state case referred to in *Gaston* was *Boccato v. City of Hermosa Beach, supra,* 29 Cal.App.4th 1797, 1809 (*Boccato*). That court correctly referred to section 52.1 as the Bane Act (see *id.* at p. 1808, fn. 3) but also mentioned other parts of the Bane Act not relevant here (Pen. Code, § 422.6 et seq.). (See *Boccato,* at p. 1809.) Ultimately, the *Boccato* court concluded that section 52.1 must be read "in conjunction with the other statutory provisions of which that section is part," specifically referring to section 51.7. (*Boccato,* at p. 1809.) *Boccato* makes no reference to the "Unruh Act."

[18] Consistent with the *Gatto* court's admonition that courts need to be more careful in describing the scope of the Act, we note that the publisher's *headnote* in *Rojo* reflects an expanded citation for the Act. Headnote 7 states: "The Unruh Civil Rights Act (Civ. Code, § 51 et seq.) has no application to employment discrimination." At the place in the text linked to the headnote, the opinion mentions only section 51 without the "et seq." (See *Rojo, supra,* 52 Cal.3d at pp. 67, 77.) Of course headnotes are not part of an opinion. (Cf. *Smith v. County Engineer of San Diego County* (1968) 266 Cal.App.2d 645 [72 Cal.Rptr. 501].)

Court precedent cited in *Rojo*. (See *Isbister v. Boys' Club of Santa Cruz, Inc.*, *supra*, 40 Cal.3d 72, 83, fn. 12 [219 Cal.Rptr. 150]; *Alcorn, supra*, 2 Cal.3d at p. 500; see also *Alch, supra*, 122 Cal.App.4th at p. 391.) But *Rojo* does not mention either section 51.7 or section 52.1, and the two earlier Supreme Court decisions were authored before either statute had become law.

The rule that employment cases cannot be based on section 51 is explained simply: Section 51, on its face, applies to "accommodations, advantages, facilities, privileges, or services in all business establishments." As the court in *Alcorn* stated, "there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." (*Alcorn, supra*, 2 Cal.3d at p. 500.)[19]

■ Thus, even if we were to conclude that sections 51.7 and 52.1 were part of the Act (which we do not), the rule expressed in *Rojo* would have no application to the present case, as neither statute contains the limiting statutory language of section 51 that was instrumental to *Rojo*'s holding. (See *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1081 [130 Cal.Rptr.2d 892, 63 P.3d 979] [cases are not authority for propositions not considered].)

### 4. *Sections 51.7 and 52.1 Authorize a Private Cause of Action in Employment Cases*

■ In the preceding sections we have held that sections 51.7 and 52.1 are not part of the Act and neither *Rojo, supra*, 52 Cal.3d 65, the cases on which it is based, nor any other authorities cited by real parties prohibit a statutory claim in employment cases. Our inquiry is not over. Ultimately, the question before us is whether the statutes in question *do* create a private cause of action in the employment field. At its core, this is a matter for the Legislature. "The question of whether a regulatory statute creates a private right of action depends on legislative intent." (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 375 [17 Cal.Rptr.3d 39].) The Legislature also has the power to limit private statutory civil actions to, for example, certain classes of individuals or types of claims. (See *Faria v. San Jacinto Unified School Dist.* (1996) 50 Cal.App.4th 1939, 1946 [59 Cal.Rptr.2d 72].)

---

[19] The scope of the Act is nevertheless broad. "[T]he reach of section 51 cannot be determined invariably by reference to the apparent 'plain meaning' of the term 'business establishment.' " (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 616 [42 Cal.Rptr.2d 50, 896 P.2d 776]) Rather, "business establishment" must be "interpreted 'in the broadest sense reasonably possible.' " (*Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670, 696 [72 Cal.Rptr.2d 410, 952 P.2d 218].)

█ Here, there is no doubt that private causes of action are expressly authorized by both sections 51.7 and 52.1. A civil action under section 51.7 is provided for in section 52, subdivision (b), which provides that anyone who commits an act proscribed in section 51.7 is liable "for the actual damages suffered by any person denied that right." Additional private remedies include punitive damages, a civil penalty and attorney fees. (§ 52, subd. (b)(1)–(3).) These rights are separate from those given to the Attorney General and other prosecutors, who may seek certain relief. (§ 52, subd. (c).)

█ Section 52.1 provides that any individual whose rights under the statute have been interfered with "may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages." (§ 52.1, subd. (b).) A plaintiff may recover damages, obtain an injunction, other equitable relief and attorney fees (§ 52.1, subd. (h)), and his or her right to proceed is independent of relief available under section 51.7 (§ 52.1, subd. (g)). The Attorney General and other prosecutors likewise have standing. (§ 52.1, subd. (a).)

█ Private causes of action under sections 51.7 and 52.1 have been recognized by the appellate courts. (See *Venegas, supra,* 32 Cal.4th at pp. 841–842; *Jones v. Kmart Corp., supra,* 17 Cal.4th at p. 332; *Bay Area Rapid Transit Dist. v. Superior Court, supra,* 38 Cal.App.4th at pp. 144–145; *Boccato, supra,* 29 Cal.App.4th 1797; *Winarto v. Toshiba America Electronics Components, Inc.* (9th Cir. 2001) 274 F.3d 1276, 1288–1290, & fn. 13.)

Since private civil remedies have been expressly authorized by the two statutes, we turn to whether there is anything in these laws that evinces an intent by the Legislature to prohibit their use in actions involving discrimination and other wrongdoing in the employment sector. We find nothing.

On their face, neither section 51.7 nor section 52.1 is restricted to certain types of cases as long as the proscribed conduct is involved. These statutes were designed to stem the number of hate crimes which the Legislature recognized had grown to an alarming proportion. (See Assem. Com. on Labor Relations, Analysis of Assem. Bill No. 2986, *supra,* Apr. 20, 1976, p. 1; Assem. Com. on Public Safety, Analysis of Assem. Bill No. 63, *supra,* as amended Mar. 2, 1987, pp. 1–2; see also *Venegas, supra,* 32 Cal.4th at pp. 845–848 (conc. opn. of Baxter, J.).) Sadly, hate does not end when an employee walks through the door of his or her place of employment. The staggering impact of cases of workplace violence based on race, religion and other classifications described in these statutes is unfortunately known to us too well. (See generally Nat. Insts. Health, Civil <http://civil.nih.gov/whatis.html> [as of Feb 27, 2006].)

Given this obvious state of affairs, we would find it odd that the Legislature intended to exclude employment discrimination, workplace violence and similar cases based on race or other characteristics from the protections of these statutes. The legislative history reveals no such intent. Assembly Bill No. 2986, which eventually became section 51.7, was assigned to the Assembly Committee on Labor Relations, a committee whose responsibilities included employment matters. A report from that committee acknowledged that, at the time of drafting, there were numerous laws protecting civil rights in "employment, housing and access to public accommodations and facilities." (Assem. Com. on Labor Relations, Analysis of Assem. Bill No. 2986, *supra*, Apr. 20, 1976). Nevertheless, the report expressed concern that there was no specific prohibition protecting individuals from "violence because of their race, religion, ancestry, or national origin." (*Ibid.*) Since "employment" was expressly mentioned in the report, it appears obvious that cases of this sort were intended to be included within the act's coverage. One of the specific advantages of the proposed legislation was that an individual could immediately file a private civil action while at the same time pursuing a complaint with the FEPC. (Assem. Com. on Labor Relations, Analysis of Assem. Bill No. 2986, *supra*, Apr. 6, 1976.) Obviously, FEPC complaints included workplace matters. Similarly, the breadth of the assembly report for Assembly Bill No. 63, which eventually became section 52.1, reflects the continuing concern over hate-crime violence. Nothing suggests an intent to exclude the workplace. (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 63, *supra*, as amended Mar. 2, 1987, pp. 1–2.)

We have found no California case that squarely upholds a private action under either section 51.7 or 52.1 in the employment context. Our Supreme Court in *Schifando, supra,* 31 Cal.4th 1074, seems to have assumed such a cause of action exists. The more narrow issue addressed by the court in *Schifando* was whether a city employee was required to exhaust both FEHA and the city charter administrative remedies as a condition to filing his employment discrimination suit. In the course of its discussion, the court stated: "In other words, although the FEHA does not limit the application of other state statutes (e.g., Civ. Code, § 51.7), or constitutional provisions involving discrimination, it expressly preempts local governmental laws, regulations, and procedures that would affect the rights included in its provisions." (31 Cal.4th at p. 1082.)[20]

The same assumption was made in *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1210 [78 Cal.Rptr.2d 533], in which the appellate

---

[20] Implicit in this statement is that FEHA does not preclude a private action under section 51.7 in the employment setting.

court affirmed an order compelling arbitration of the plaintiff's claims. One of the causes of action ordered into arbitration was a section 51.7 claim against the plaintiff's employer.

In *Winarto v. Toshiba America Electronics Components, Inc., supra,* 274 F.3d at pages 1288–1290, the Ninth Circuit upheld a jury verdict based on, among other things, sections 51.7 and 52.1 for workplace violence motivated by gender and national origin bias. The court construed the statutes broadly in keeping with their statutory purpose. "[T]here is no requirement that the violence be extreme or motivated by hate in the plain language of the sections, or in the cases construing them; there is also no requirement that the act constitute a crime. If the California legislature wanted to limit the reach of the statute to extreme, criminal acts of violence, it could have explicitly said so. What it did instead was create civil liability which sweeps more broadly than the common, colloquial meaning of the phrase 'hate crime.' " (274 F.3d at p. 1289.) There was no discussion that the statutes could not be used in a private civil action for workplace violence or intimidation.

Finally, in *Diem v. City and County of San Francisco* (N.D. Cal. 1988) 686 F.Supp. 806, 812, the plaintiff filed a religious discrimination claim against his former employer. The defendant claimed a cause of action based on section 51.7 was preempted by FEHA. The United States District Court denied motions for judgment on the pleadings and summary judgment on the statutory claim, holding: "This civil code section asserts that California residents have a right to be free from violence or threats of violence directed against them on account of, among other factors, their religion. Civil Code § 52(b) permits anyone whose rights under Section 51.7 have been violated to collect both actual and statutory damages. Sections 52(e) and (f) specifically provide that this statute furnishes an independent basis for recovery apart from the Fair Employment and Housing Act. Plaintiff has alleged sufficient threats of violence, notwithstanding the time-barred assault, to state a cause of action under this section." (*Diem, supra,* 686 F.Supp. at p. 812; see also *Burnette v. Godshall* (N.D. Cal. 1993) 828 F.Supp. 1439, 1446 [private cause of action under section 51.7 based on workplace assault by coworker not preempted].)

▇▇▇ We conclude that nothing in either the language of sections 51.7 and 52.1 or in their history expresses a legislative intent to exclude employment discrimination or other employment cases from their ambit. On the contrary, given the need for employees to be protected from the conduct condemned by the Ralph Civil Rights Act of 1976 and the Tom Bane Civil Rights Act, limitations as suggested by real parties would do serious disservice to the effectiveness of this legislation.

## DISPOSITION

The petition is granted. The trial court is ordered to: (1) vacate its order of April 26, 2005, (a) sustaining the demurrer without leave to amend as to the third cause of action for violation of sections 51.7 and 52.1, and (b) granting the motion to strike Stamps's request for attorney fees and penalties under these sections, and (2) issue a new order overruling the demurrer and denying the motion to strike.

Petitioner is to recover his costs.

Cooper, P. J., and Flier, J., concurred.