[No. B231817. Second Dist., Div. Five. Dec. 20, 2012.]

SYLVIA VENTURA, Plaintiff and Respondent, v.
ABM INDUSTRIES INCORPORATED et al., Defendants and Appellants.

COUNSEL

Ballard Rosenberg Golper & Savitt, Christine T. Hoeffner and Stephanie Kantor for Defendants and Appellants.

Rastegar & Matern, Matthew J. Matern, Paul J. Weiner; Pine & Pine and Norman Pine for Plaintiff and Respondent.

OPINION

**ARMSTRONG, J.**—ABM Industries Incorporated, ABM Janitorial Services, Inc., and American Building Maintenance Company appeal from the judgment entered against them and in favor of respondent Sylvia Ventura, on Ventura's complaint. We affirm.

## FACTS

Ventura worked for defendants[1] as a janitor. In December of 2004, Carlos Manzano became her supervisor. In 2007, she filed this lawsuit.[2] The case went to the jury on causes of action for negligent supervision and hiring, and violation of Civil Code[3] section 51.7, subdivision (a), which provides that "All persons within the jurisdiction of this state have the right to be free from

---

[1] American Building Maintenance Company is a wholly owned subsidiary of ABM Janitorial Services, Inc., which is a wholly owned subsidiary of ABM Industries Incorporated. Defendants sometimes assert that while Ventura's trial theory was that all defendants were her employers and were equally liable, that was not the case. However, they make no specific argument on the point, and we thus do not consider it. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273].)

[2] Manzano was also a defendant. Judgment was entered against him, but he has not appealed.

[3] All further statutory references are to the Civil Code unless otherwise indicated.

any violence, or intimidation by threat of violence, committed against their persons or property because of" specified characteristics, including sex.[4]

The complaint alleged a history of harassment by Manzano and an act of violence by Manzano, ratified by defendants. Through her own testimony, the testimony of coworkers, and other evidence, including tapes of voice mails left by Manzano, Ventura produced evidence in support of her allegations.

That evidence was that within a few weeks of becoming Ventura's supervisor, Manzano began flirting with her and telling her that she was pretty and that he was in love with her, advances which Ventura rejected.

Her previous supervisor had never checked in with her during her shift, but only checked her work when it was done. Manzano checked on her several times during a shift. At some point, he started checking on her more often, as often as five times when she was cleaning the bathrooms and twice when she was cleaning offices. He would stand very close to her, compliment her, look at her buttocks, and ask her questions about her family. Ventura was afraid. She told Manzano to leave her alone.

Over time, Manzano became more aggressive. Once, when Ventura was cleaning an office, he pulled her arm, pushed her against a wall, and told her that he liked her, and to pay attention to him. Another time, in an elevator, he asked her to kiss him, and leaned in very close. The cleaning cart blocked him from kissing her.

He had also touched and kissed two of the other janitors, Esther Mendoza and Mayra Duarte, drank at work, and was frequently drunk at work.

During the investigation of Ventura's complaint, Duarte, identified by employee Carmen Soto (and later by Ventura) as an employee who was sexually involved with Manzano, complained about Manzano. Duarte told defendants that Manzano "made me have relations with him" at work, threatening to call her husband and say that they were lovers if she did not comply.

Ventura did not complain about Manzano because she did not think she would be believed, but might be disciplined. She testified that she had seen this happen to other workers. Alicia Bravo had complained about area supervisor Israel Martinez, who was the supervisor above Manzano. Martinez

---

[4] Under section 52, subdivision (b), any person who "denies the right provided by Section 51.7 or 51.9" is liable for compensatory damages, a civil penalty of $25,000, and attorney fees.

took her job away. Soto had complained about harassment from Manzano. She was removed from the building.

Soto herself testified that soon after Manzano arrived, he began a relationship with Duarte. He also paid attention to Soto in order to make Duarte jealous. In Duarte's presence, he complimented Soto, rubbed her back, touched her face and hands, pulled her necklace from under her shirt, and asked her for kisses. This took place between January 2005 and the time Soto left the building.

In May of 2005, Soto complained to her union about this conduct, writing down "everything that was going on in the building." She asked that the complaint be faxed to defendants, and was given a fax confirmation sheet, showing that it had been sent. Defendants' records included a copy of the complaint.

Also in May, Soto was suspended, and then moved to another building. Defendants' records showed that the discipline was for inciting negativity in the building, including advising coworkers to falsely accuse Manzano of sexual harassment, conduct which Soto denied.

Both Ventura and Soto testified that Manzano and area supervisor Martinez were good friends, another reason why they believed that a complaint would be useless. In May, Ventura asked for a transfer to another building, telling a Mr. Ramiro that she wanted a transfer because Manzano was in a relationship with Esther Mendoza, who was jealous of her. She was offered a transfer which would cost her benefits and seniority. Later she asked area supervisor Martinez for a transfer, giving the same reason. Martinez said that it would be difficult because nobody wanted her work schedule. (Ventura worked from about 4:30 p.m. to about 3:30 a.m.)

Ventura spoke to area supervisor Martinez again on August 21, 2005, after she saw Manzano and other employees drinking in the janitor's room, and after Manzano came up to her, drunk, and shouted at her and told her that he liked her. Ventura told Martinez that Manzano and Esther Mendoza were drinking, and that he should come to the building to see the refrigerator full of beer. He said that he could not do it, because "they would take reprisals against him," but that he would "keep a better eye on her."

On August 22, 2005, she again saw Manzano drinking at work. While she was cleaning, he left her several voice mails, suggesting in one of them that she "had had a good time" with her husband the day before.

Later that day, while Ventura was cleaning the handicapped stall in one of the men's bathrooms, Manzano entered the bathroom and closed the door. He

grabbed her arms from behind, squeezed her, and "started rubbing his parts on [her] buttocks." She tried to shout, but he had his arm across her neck so tightly that she could not breathe. His fingers left marks on her. He also bit her.

Ventura managed to break free. She hid in an office, under a desk, until she felt safe. She called a friend and also called area supervisor Martinez. She did not tell Martinez about the incident, but told him that Manzano and others were drinking in the janitor's room and that he should come and see. He told her that he could not do that right now.

She left the building, then returned, afraid that if she left, she would lose her job. She again called Martinez, this time telling him what had happened. He told her to give Manzano her keys and tell him that she was leaving because she could not bear it any longer. He also told her to come to the office the next day to prepare a statement. Ventura said that she was going to call the police. Martinez told her not to, because company ethics did not allow it. (Ventura did go to the police, who documented bruises.)

Ventura called Manzano and told him that she was leaving and that he had to pick up her keys, and that she had called Martinez. Manzano came downstairs. Ventura threw the keys at him and took off running to her car. He followed, calling her name, and saying "oh, we're going to file a lawsuit, right?" and telling her that he was a very vengeful person. She got into her car. Manzano held the door so that she could not close it, and reached in and banged on the steering wheel, swearing at her and telling her that he loved her. She put the car in reverse, and he let go.

Ventura stopped at a 7-Eleven and called Martinez. She was shaking and upset and felt too nervous to drive. Martinez picked her up and drove her home. On the way, he told her that Manzano had "already had those problems in different buildings."

Ventura also produced evidence concerning defendants' investigation of her allegations, which she contended was a sham, designed to find no wrongdoing by Manzano. That evidence was that Ventura gave defendants her statement on August 24, but that it took defendants' regional human resources director almost a month to contact her and set up an appointment. During the meeting, the human resources director was distracted, took phone calls, and failed to accurately record what Ventura said. When Ventura spoke of Manzano's relationship with Esther Mendoza, the human resources director suggested that Ventura was jealous. When Ventura spoke about area supervisor Martinez, who had grabbed her hand and picked flowers for her after the attack by Manzano, the director said, "No. How is that possible? He's a respectable man."

Although defendants obtained written statements from several employees, including Manzano, Martinez, and Esther Mendoza, they did not obtain statements from three witnesses identified by Ventura, who told defendants that those witnesses had critical, firsthand information.

Ventura produced evidence concerning Soto's earlier complaint about Manzano. Soto identified a witness to the behavior, another employee, but defendants never questioned that witness. Defendants' files included a copy of Soto's complaint, but neither Soto's complaint nor any other complaint was noted in Manzano's personnel file. The designated person most knowledgeable about defendants' personnel files testified that sexual harassment complaints against an employee were not necessarily noted in that employee's personnel file.

Manzano was not disciplined for any of this, not even for harassing phone calls to Ventura, documented with voice mail recordings and telephone records. Although he was suspended for several days immediately after Ventura's complaint, he was reinstated before human resources spoke to Ventura, and was paid his salary for the days he had been suspended.

Defendants offered evidence in support of their theory of the case, which was that Manzano and Ventura were involved in a consensual sexual relationship, that Ventura fabricated allegations against him after he ended the relationship, and that defendants fully investigated Ventura's allegations but that her complaint could not be substantiated. Instead, the evidence favored Manzano. Defendants also sought to impeach Soto and other witnesses, and to establish that Ventura had threatened to make false claims against Manzano.

The jury answered special verdicts.

Under the heading "acts of violence," the jury found that Manzano committed violent acts against Ventura, that his perception of her sex was a motivating reason for his conduct, and that his conduct was a substantial factor in causing her harm.

Under the heading "ratification of acts of violence," the jury found that each defendant[5] learned of Manzano's conduct after it occurred, and approved and ratified the conduct.

Under the heading "threats of violence," the jury found that Manzano threatened violent acts against Ventura, that his perception of her sex was a

---

[5] The special verdicts asked for a separate finding as to each defendant.

motivating reason for his conduct, and that a reasonable person in Ventura's position would have believed that he would carry out his threats and would have been intimidated by his conduct.

Under the heading "ratification of threats of violence," the jury found that each defendant learned of Manzano's conduct after it occurred, and approved and ratified the conduct.

Under the heading "negligent hiring, supervision or retention," the jury found that Manzano was unfit or incompetent to perform the supervisory work for which he was hired, that his unfitness or incompetence harmed Ventura, that each defendant knew or should have known that he was unfit or incompetent and that his unfitness created a particular risk to others, and that defendants' negligence in hiring, supervising, and retaining Manzano was a substantial factor in causing Ventura harm.

The jury was asked to award $100,000 in compensatory damages, attributing the whole amount to past mental suffering. The jury did not find malice, fraud, or oppression for purposes of punitive damages. Judgment was entered in the amount of the compensatory damages, plus a $25,000 civil penalty pursuant to section 51.7.

Ventura moved for attorney fees, calculating a lodestar of $1.13 million and asking for an award of between $1,697,000 and $1,979,000. The court awarded $550,000 in fees.

## DISCUSSION

### A. The Cause of Action for Negligent Hiring and Supervision

Defendants contend that this cause of action was barred by the doctrine of workers' compensation. We agree with Ventura that the issue is waived. It is true that defendants raised the defense in their answer, but we cannot see that they ever asked the court to rule on the issue.

In her brief on appeal, Ventura asserts that they never did, and defendants do not dispute the assertion. Instead, their reply brief argues that workers' compensation is jurisdictional, and cannot be waived.

Not so. Where a complaint indicates that an employment relationship exists between a plaintiff and a defendant, it is the defendant's burden to plead *and prove* that the act applies. The trial court has jurisdiction "unless and until" the defendant proves otherwise. (*Doney v. Tambouratgis* (1979) 23 Cal.3d 91,

98 [151 Cal.Rptr. 347, 587 P.2d 1160]; see *Lucich v. City of Oakland* (1993) 19 Cal.App.4th 494, 498–499 [23 Cal.Rptr.2d 450].) Defendants did not prove otherwise.

■ On this cause of action, defendants also raise a substantial evidence claim. We find substantial evidence. Ventura presented evidence that defendants knew that Manzano was sexually involved with some female employees, was harassing at least one other, and was drinking on the job, but did nothing. That is, there was evidence that Soto complained to the union about Manzano and defendants got a copy of the complaint. There was evidence that Ventura twice requested a transfer, telling defendants that Manzano was sexually involved with another employee, and evidence that she later told defendants that he was drinking on the job. There was also evidence that after he knew the details of Manzano's attack on Ventura, Martinez told Ventura that Manzano had had similar problems before.

As defendants argue, this is not evidence that they knew that Manzano had been violent before, but we cannot see that the negligent hiring and supervision claim depends on such evidence.

### B. The Cause of Action for Violation of Section 51.7

*The trial court did not err when it allowed Ventura to file a second amended complaint.*

*Facts*

The original complaint, filed on June 7, 2007, brought numerous causes of action,[6] including a cause of action against defendants under section 51.7. All causes of action were based on the same factual allegations: the incident of August 22, 2005; Manzano's protestations of love, requests for dates, and so on throughout Ventura's employment; and defendants' awareness of Manzano's conduct and lack of response.

Defendants moved for summary judgment or summary adjudication on all causes of action. The motion was granted on causes of action under sections 51.9 (sexual harassment) and 52.4 (gender violence), and on a cause of action for sexual battery, although the court granted Ventura leave to amend as to that cause of action. The motion was denied as to the other causes of action.

---

[6] The causes of action were sexual harassment under section 51.9, sexual battery under section 1708.5, violence or intimidation by threat of violence under section 51.7, battery under section 52, intentional infliction of emotional distress, negligent hiring and supervision, and a cause of action against Manzano for gender violence under section 52.4.

On September 9, 2009, Ventura filed a first amended complaint which did not reflect the court's ruling on summary adjudication.

The caption lists the causes of action which survived summary judgment: sexual battery, violation of section 51.7, battery, intentional infliction of emotional distress, and negligence. However, the body of the complaint is inconsistent with the caption. In the body of the complaint, defendants are sued for sexual harassment under section 51.9 (although summary judgment had been granted as to that cause of action), sexual battery, negligence, and intentional infliction of emotional distress, and Manzano is sued for gender violence under section 52.4. The cause of action under section 51.7 is not in the body of the complaint.

The factual allegations in this first amended complaint are the same as those in the original complaint, except that the allegations concerning the August 22, 2005 incident are expanded to include one more allegation, that Manzano touched Ventura's buttocks with the front of his body.

The two complaints identically pray for compensatory damages, punitive damages, a civil penalty of $25,000 pursuant to section 52, subdivision (b)(2) (which provides for such a penalty for violation of several Civ. Code sections, including § 51.7), and attorney fees pursuant to §§ 52, 52.1, and 52.4 (which provide for fees for causes of action under several Civ. Code sections, including § 51.7). The punitive damages claim in both complaints specifically references section 51.7.

On May 24, 2010, the day before trial, Ventura moved ex parte for leave to file a second amended complaint which added the cause of action for violation of section 51.7 to the body of the complaint, writing that the allegations concerning that cause of action had been inadvertently omitted. The court denied the motion without prejudice, finding Ventura's pleadings confusing. However, the court noted that Ventura would probably refile, and heard argument from defendants. Defendants opposed the motion to amend the complaint, arguing that they had reasonably believed that the "battery cause of action" had been abandoned.

Ventura did refile, with a proposed second amended complaint which had factual allegations and prayers for damages which were identical to those of the first amended complaint. When the court heard the motion on May 25, counsel for Manzano, who was not present at the argument on the earlier motion, argued that the amendment prejudiced his client, citing the $25,000 penalty. Counsel for defendants argued that when causes of action were omitted from the first amended complaint, they were dismissed.

The court permitted Ventura to file the second amended complaint, finding no prejudice to defendants, noting that they had not identified any additional

discovery they would have conducted, and also noting that the factual allegations and theories supporting the cause of action under section 51.7 were the same as those for other causes of action.

Defendants contend that this ruling was in error.

*Discussion*

Defendants first raise contentions concerning notice, contending that Ventura's motion violated California Rules of Court, rules 3.1203 and 3.1204 in that it was not timely and did not recite with specificity the relief requested. Defendants contend that these errors gave them inadequate opportunity to prepare an opposition, but they did not raise that concern at trial, when they might have been allotted more time, and we thus see no grounds for reversal on this theory.

■ Nor do we see abuse of discretion (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 945 [65 Cal.Rptr.2d 777]) in the trial court ruling. Trial courts " 'are bound to apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial,' " where the adverse party will not be prejudiced. (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761 [135 Cal.Rptr.2d 433].) Defendants claim prejudice, but we see none.[7]

First, the cause of action under section 51.7 was in the original complaint. Defendants moved for summary judgment on the cause of action, so that they clearly took discovery on it. The cause of action survived summary judgment and is referenced in the first amended complaint in both the caption and the prayer for damages. The first amended complaint is hardly exemplary in its clarity, but it is at worst ambiguous as to the causes of action.

Next, although defendants argue that they were denied an opportunity to prepare a defense to the cause of action under section 51.7, they did not ask the trial court for more time, and give no specifics as to how their defense would have differed, given that the cause of action under section 51.7 is based on the same factual allegations as are all the other causes of action, and that the defense was that the factual allegations were not true.

Defendants also argue that they were denied an opportunity to properly evaluate the case for settlement, because the first amended complaint did not

---

[7] Defendants sometimes attempt to cast their argument as an argument that Ventura made false statements in her pleadings. A party's statement that the opposing party will not be prejudiced by a given event cannot be considered a statement, or mistake, of fact. It is advocacy.

seek attorney fees and the statutory penalty, but that is not quite so. Section 51.9, one of the causes of action against defendants in the first amended complaint, provides that a plaintiff bringing a cause of action under the section may recover a civil penalty of $25,000 and attorney fees. (§ 51.9, subd. (b).) Summary adjudication was granted as to that cause of action, so that it was not properly in the complaint, but it was there nonetheless. We thus cannot see that defendants were prejudiced by a lack of opportunity to properly evaluate the case for settlement. We do not say that it was defendants' duty to clarify the mistakes in Ventura's complaint, but we do say that a serious evaluation of the case for settlement would have resulted in a resolution of this obvious problem.

### The statute applies to employment cases

■ Defendants argue that the statute does not apply in employment cases because our Supreme Court has held that the Unruh Civil Rights Act (§ 51 et seq.) does not apply to such cases. (*Rojo v. Kliger* (1990) 52 Cal.3d 65 [276 · Cal.Rptr. 130, 801 P.2d 373].) They acknowledge that *Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441 [39 Cal.Rptr.3d 706] held that section 51.7 is not part of the Unruh Civil Rights Act and does apply to employment cases, but argue that *Stamps* was wrongly decided.

*Stamps* thoroughly analyzed the relevant cases and statutes, including the legislative history. We agree with both the reasoning and result of that case.

### Hatred is not an element

Defendants next argue that section 51.7's reference to threats or violence "because of" a person's sex logically means that the offending act must be based on hate. They further argue that there was no evidence of hatred here, because Manzano told Ventura that he loved her.

■ We find that hate is not an element, though we hasten to add that even if it was, we would reject defendants' argument that Manzano's protestations of love mean that there was no evidence of hate. The evidence was that Manzano "loved" Ventura enough to attack her and hurt her. That is evidence from which a trier of fact could find hate.

Nor do we agree with defendants that "because of" logically means "hatred." Section 51.7 provides that all persons "have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of . . ." specified characteristics, including sex, and provides for a civil remedy for violation of that right. Nothing in the statute requires that a plaintiff prove that the offending act was motivated by hate.

It is certainly true that the statute "has been described (together with Civ. Code, § 52.1) as 'provid[ing] a civil remedy for hate crimes.' (*D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 844 [98 Cal.Rptr.3d 300] . . . .)" (*Ramirez v. Wong* (2010) 188 Cal.App.4th 1480, 1486 [116 Cal.Rptr.3d 412].)[8] The issue in *Harvard-Westlake* was the imposition of arbitration expenses on a plaintiff suing under sections 51.7 and 52.1. In *Ramirez*, the question was "threat of violence" under section 51.7, and the holding was that "[t]here can be no 'threat of violence' without some expression of intent to injure or damage plaintiffs or their property . . . ." (188 Cal.App.4th at p. 1486.)

Neither of those cases, or indeed any other case, considered or decided that section 51.7 only creates a cause of action for acts based on hatred, and requires proof of hatred. Rather, the cited cases use the term "hate crime" as a loose description of several statutes. It is perhaps an unfortunate use of the expression, because the statute itself does not define a crime and does not require a plaintiff to prove hate.

"It may be true that this section and other similar California statutes were enacted 'in response to [the] alarming increase in hate crimes.' [Citation.] Nevertheless, there is no requirement that the violence be extreme or motivated by hate in the plain language of the sections, or in the cases construing them; there is also no requirement that the act constitute a crime. If the California legislature wanted to limit the reach of the statute to extreme, criminal acts of violence, it could have explicitly said so. What it did instead was create civil liability which sweeps more broadly than the common, colloquial meaning of the phrase 'hate crime.' Without clear evidence that the legislature intended otherwise, we will not disturb the plain meaning of the statute." (*Winarto v. Toshiba America Electronics Components* (9th Cir. 2001) 274 F.3d 1276, 1289.)

*The jury instruction*

The jury was instructed with the standard instruction for this tort, CACI No. 3023A/B.[9] Defendants contend that the instruction is erroneous because

---

[8] Under Penal Code section 422.55, "hate crime" means "a criminal act committed, in whole or in part, because of one or more of the following actual or perceived characteristics of the victim: [¶] (1) Disability. [¶] (2) Gender. [¶] (3) Nationality. [¶] (4) Race or ethnicity. [¶] (5) Religion. [¶] (6) Sexual orientation. [¶] (7) Association with a person or group with one or more of these actual or perceived characteristics."

[9] The jury was instructed that Ventura had to prove that Manzano committed a violent act against her, that a motivating reason for the act was his perception of her sex, that she was harmed, and that Manzano's conduct was a substantial factor in causing her harm; or that Manzano intentionally threatened violence against her, that a motivating reason for his conduct was his perception of her sex, that a reasonable person in her position would have believed that

it does not require proof of hate and because it instructed the jury that Ventura's burden was to show that Ventura's sex was "a motivating reason" for Manzano's conduct. Defendants contend that Ventura's burden was to prove causation under a "but for" standard.

■ The first problem with the contention is that at trial defendants agreed to the instruction, telling the court that it "covered all the elements." Defendants contend that this does not matter, citing the rule that "giving an instruction . . ." is deemed excepted to. (Code Civ. Proc., § 647.) We cannot see that the rule applies. Code of Civil Procedure section 647 does not negate the doctrine of invited error. If a party affirmatively agrees to an instruction, we do not ignore that fact and deem an objection.

At any rate, for the reasons expressed above, we reject the contention that the instruction was faulty because it did not tell the jury that it could not find for Ventura unless it found that Manzano was motivated by hate.

As to defendants' second contention, concerning causation, we would not reverse even if we found error. That is so because, on the facts of this case, the instruction defendants now seek would not have made any difference. The jury was presented with two very different sets of facts, that Manzano assaulted Ventura because he was "in love with her," and that he did not assault her. There was no evidence which would support a jury finding that he assaulted her, but did so for another reason.

### Ratification

On this issue, the jury was instructed that in order to establish her claim that defendants were responsible for Manzano's conduct, Ventura "must prove . . . that [defendants] learned of Defendant Carlos Manzano's conduct after it occurred," and that "defendants approved Defendant Carlos Manzano's conduct." The instruction concluded, "Approval can be shown through words, or it can be inferred from a person's conduct."

Defendants contend that the instruction was erroneous because it did not tell the jury that there is ratification only if the employee intended to act on behalf of the employer, the employer actually knows that the wrongful conduct occurred, and the employer benefitted from the conduct, and that a disputed allegation is not actual knowledge.[10] They similarly argue that there

---

he intended to carry out his threat, that she was harmed, and that Manzano's conduct was a substantial factor in causing her harm.

[10] At trial, defendants asked for a different instruction, that their "approval of Mr. Manzano's conduct may be inferred from its failure to discharge him after learning of his conduct.

was insufficient evidence for the finding of ratification because there is no evidence of those purported elements. We can see no error.

As to "actually know" versus "learned of," we can see no practical difference. Ventura's theory was that defendants were informed that Manzano was engaged in sexual relationships at work, drank at work, and was, at least, a harasser, but did nothing. Then, after Ventura was assaulted, they skewed their investigation so as not to find out that she was telling the truth about what had happened to her. Defendants' theory was that their investigation was thorough, and showed that Ventura was lying. Both sides produced evidence in support of their theories.

It is obvious that a jury which believed that Ventura lied about the assault, and that her lie was exposed by defendants' thorough investigation, would not have found that defendants "learned of" Manzano's conduct. Under these circumstances, an instruction that a defendant must have "actual knowledge," or that a disputed allegation is not enough to show ratification, would amount to a comment on the evidence, something which has no place in a jury instruction. (*People v. Wright* (1988) 45 Cal.3d 1126, 1136 [248 Cal.Rptr. 600, 755 P.2d 1049].)

Nor do we think the jury was misinstructed because it was not instructed that ratification depends on a finding that the employee acted on behalf of the employer and that the act benefitted the employer. Instead, the instruction correctly stated the law.

■ " '[A]n employer may be liable for an employee's act where the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort. [Citations.] The failure to discharge an employee who has committed misconduct may be evidence of ratification. [Citation.] The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery. [Citations.] Whether an employer has ratified an employee's conduct is generally a factual question. [Citation.]' " (*C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1110 [87 Cal.Rptr.3d 424].)

The jury instruction reflects those rules of law.

### C. CACI No. 204

Ventura proposed that the jury be instructed, pursuant to CACI No. 204, that "[y]ou may consider whether one party intentionally concealed or

---

However, if you find that the material facts concerning that conduct were either suppressed or unknown to [defendants], you may not find that [defendants] learned of his conduct."

destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party." This was based on the evidence that in their investigation defendants did not interview witnesses she identified, and that information (such as the names of witnesses) had been redacted from defendants' investigation file.

The court reserved a decision on this instruction in order to see whether the evidence supported it. At the close of trial, Ventura proposed this instruction, based on the testimony of defendants' human resources director William Rojas, the designated person most knowledgeable concerning defendants' personnel records. Counsel for defendants said only, "Well, I didn't take that as evidence of suppression, but that's my view." The court gave the instruction.

Defendants now contend that the instruction was improper, because redaction and failure to interview witnesses in a personnel matter do not amount to evidence of suppression. They further contend that prejudice is demonstrated by the fact that the jury was split on multiple claims.

We can see no error in the trial court's ruling. The jury was told only that it could "consider whether one party intentionally concealed or destroyed evidence." Defendants were free to present the jury with evidence that (as counsel represented to the court), the redactions were only of telephone numbers, and that the failure to interview certain witnesses was proper, and to argue that evidence to the jury.

### D. Evidentiary Rulings

*Soto's deposition testimony*

Both Ventura and defendants designated portions of Soto's deposition in a different lawsuit, one which she filed against defendants ABM Industries Incorporated and ABM Janitorial Services, Inc., before Ventura's lawsuit was filed, and both parties read excerpts from that deposition to the jury. Defendants now contend that the deposition testimony should not have been admitted, because the legal theories were different in the earlier lawsuit, and because American Building Maintenance Company was not a party to the earlier lawsuit.

We do not further consider the contention, because defendants did not object at trial. Defendants did move in limine to exclude evidence of Manzano's sexual harassment of persons other than Ventura, including Duarte and Soto, and moved in limine to exclude evidence of other lawsuits, including Soto's lawsuit, but those motions do not concern themselves with the fact of the deposition testimony or the grounds now asserted. Later, when

the issue came up at trial, defendants did not object to use of deposition testimony, except to say that the deposition was not properly signed by the court reporter, a problem which Ventura remedied with a signed copy. Indeed, as we earlier noted, defendants themselves designated portions of the deposition and presented those portions to the jury as evidence.

*Other contentions*

Here, defendants contend that Ventura introduced evidence which should have been excluded, characterizing the evidence as "a cesspool of sleazy rumor, gossip, and character attacks" and providing dozens of citations to testimony and argument. By way of argument, they assert that evidence relevant to the negligence claim was inadmissible because the claim was barred by the workers' compensation law, that earlier complaints concerning Manzano were irrelevant because this is not a California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) case, and that Ventura should not have been allowed to refer to harassment, for the same reason. They also seem to assert that Soto's testimony was irrelevant because she did not file suit until 2007—ignoring evidence of her earlier union complaint.

The arguments are unpersuasive. Given that defendants did not assert a workers' compensation bar, evidence relevant to the negligence claim was properly before the jury. Evidence of earlier complaints about Manzano was relevant to both ratification and negligent supervision and hiring. The fact that this is not a FEHA case does not make the word "harassment" improper or evidence of harassment irrelevant.

### E. The Fee Award

■ Section 51.7 provides for an award of attorney fees. Ventura calculated the lodestar (hours and hourly rates) at $1.13 million and moved for an award of between $1,697,000 and $1,979,000.

The court awarded $550,000 in fees, explaining its reasoning at the hearing. The court said: "I want to start by saying that I am basing my decision on the award of reasonable attorneys' fees in this case from the perspective of having been the judge that has presided over the case for most of the pretrial work and for the entire trial. [¶] And I think that case law is to the effect that a trial court judge is really in the best position to be able to evaluate what hours were reasonably expended and what reasonable attorneys' fees should be awarded. I take into account a number of factors in making that determination, of course starting with the lodestar."

The court then found that the total number of hours claimed was excessive, that some of the associate billing rates were excessive, and that the overall

number of hours billed was excessive. The court noted duplication of work (including the fact that three to four attorneys were present on each day of trial), that some of the causes of action were disposed of by summary adjudication or abandoned during trial, that Ventura's pleading errors had created additional work for both plaintiff and defendant, and that the claims were not particularly complicated. The court also eliminated hours spent on claims other than the section 52.7 claim, rejecting Ventura's argument that all of the work on all causes of action was inextricably intertwined.

*Discussion*

Defendants' first contention is that Ventura failed to meet her burden of showing the actual and reasonable number of hours spent on the section 51.7 claim. They cite the fact that the court made adjustments to the amounts which Ventura sought, argue that Ventura did not meet her burden of proof, and conclude that because she did not meet her burden, she should have been awarded nothing. The conclusion is wrong. To the extent that Ventura did not meet her burden, she did not prevail. Defendants can ask for no more.

Defendants next argue that the court failed to identify the lodestar amount and erred when it refused them a statement of decision. A trial court is not required to issue a statement of decision for an attorney fee award. (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 65 [100 Cal.Rptr.3d 152].) Defendants cite *Gorman* for the ruling that "When a trial court makes an award that is inscrutable to the parties involved in the case, and there is no apparent reasonable basis for the award in the record, the award itself is evidence that it resulted from an arbitrary determination." (*Id.* at p. 101.) This is not such a case. The court explained its ruling in detail.

Finally, defendants argue that the award shocks the conscience, and was likely based on the improperly admitted and inflammatory evidence.

Our review of a trial court's decision on fees is "highly deferential." (*Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 777 [118 Cal.Rptr.2d 629].) That is because, as the trial judge observed here, that judge is the best judge of the value of the professional services rendered in the case. The trial judge's decision on fees " ' "will not be disturbed unless the appellate court is convinced that it is clearly wrong." ['] " (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511].)

Here, the record reveals that the court considered all relevant pleadings, and the entire case, made a decision based on reason, and articulated those reasons. The trial judge's decision will thus not be disturbed on appeal.

## DISPOSITION

The judgment is affirmed. Respondent to recover costs on appeal.

Turner, P. J., concurred.

**MOSK, J.,** Concurring and Dissenting.—Plaintiff Sylvia Ventura originally alleged battery, intentional infliction of emotional distress, negligence, and ratification, all arising out of claims that one of the defendants—a supervisor—had been sexually pursuing plaintiff and made physical, unwanted advances toward her. Plaintiff did not assert any claims under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), which requires an employer to take reasonable steps to prevent harassment (Gov. Code, § 12940, subd. (j)(1)), and under which attorney fees are available (Gov. Code, § 12965, subd. (b); *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970 [104 Cal.Rptr.3d 710, 224 P.3d 41]). Plaintiff, instead, turned to a novel and unprecedented avenue for attorney fees and penalty awards by successfully invoking Civil Code section 51.7.[1]

I would affirm the judgment as to all claims except the section 51.7 claim and the awards of attorney fees and a penalty based on that section. The jury found defendants' conduct towards plaintiff was culpable. There were adequate causes of action to vindicate plaintiff's right to be free from such unacceptable conduct.

I would reverse as to the section 51.7 remedies because I do not believe that section is applicable to the facts in this case. As I interpret section 51.7, there was not substantial evidence to support the jury verdict on that provision. I believe my interpretation of section 51.7 is supported by the provision's language and legislative history, and by authorities. Admittedly, there is no authority directly addressing the application of section 51.7 to a situation such as the one in this case.

Section 51.7, subdivision (a) provides as follows: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive." As relevant here, section 51, subdivisions (b) and (e) include as a characteristic a person's

---

[1] All further statutory references are to the Civil Code unless otherwise specified.

sex—sometimes referred to as a person's gender. (See Gov. Code, § 12926, subd. (q); Pen. Code, § 422.56, subds. (c), (d).)[2]

I interpret "on account of any characteristic" as meaning that the "violence" or "intimidation by threat of violence" must be committed because of an animus or discriminatory intent against a "characteristic" of race, sex, etc. The court in *D.C. v. Harvard-Westlake School* (2009) 176 Cal.App.4th 836, 856–859 [98 Cal.Rptr.3d 300], discussed the occurrence of "hate crimes" in considering a plaintiff's claims under sections 51.7 and 52.1. The court said, " 'The Legislature's focused effort to combat discriminatory and pernicious conduct often referred to as hate crimes began with the 1976 enactment of Civil Code section 51.7, commonly referred to as the "Ralph Civil Rights Act" or the "Ralph Act." . . . The obvious purpose of the Ralph Act is to declare unlawful, and civilly actionable, any *acts of violence or intimidation by threats of violence* directed against any individual because of his actual or perceived membership in a minority or similarly protected class. [¶] . . . [¶] In this same vein, 10 years later, the Legislature enacted [the Bane Act (Civ. Code, § 52.1),] to further address the rising tide of hate crimes in California . . . . [¶] . . . [¶] [The] central provisions of the Bane Act have not been substantively changed since its enactment nearly 20 years ago.' " (176 Cal.App.4th at p. 858.)

The court added, "Thus, '[California's] "hate crimes" law[s] clearly establish[] that crimes motivated by bigotry and bias are against the public policy of the state.' (*Webb v. Puget Sound Broadcasting Co.* (1998) 1998 Wn.App. Lexis 1795, p. *9 [138 Lab.Cas.(CCH) ¶ 58,612, p. 89,647, 1998 WL 898788, p. *3].) '[D]epending on the circumstances, insults or harassment directed to individuals on the basis of historically disfavored personal characteristics more readily transgress contemporary *social bounds* than do other forms of antagonistic behavior.' (*Williams v. Tri-Met* (1998) 153 Or.App. 686, 691 [958 P.2d 202, 204–205].) To be specific, '[p]roviding a safe and non-discriminatory environment for students obviously serves the public interest . . . . In addition, fostering tolerance and thereby decreasing hate crimes among students is in the public interest.' (*Doe v. Perry Community School Dist.* (S.D. Iowa 2004) 316 F.Supp.2d 809, 839, citation omitted.) [¶] In upholding a state hate crimes law against a free speech challenge under the First Amendment (U.S. Const., 1st Amend.), the United States Supreme Court explained: '[T]he Wisconsin statute singles out for enhancement bias-inspired conduct because this conduct is thought to inflict greater individual and *societal harm*. For example, according to the State and its *amici*, bias-motivated crimes are more likely to provoke retaliatory crimes, inflict distinct emotional harms on their victims, and incite *community unrest* . . . . The

---

[2] Historically, gender has been used as a grammatical distinction. Through usage, gender has come to refer to the sex of a person, particularly when concerning discrimination—e.g., "gender-based discrimination."

State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases. . . .' (*Wisconsin v. Mitchell* (1993) 508 U.S. 476, 487–488 [124 L.Ed.2d 436, 113 S.Ct. 2194, 2201] . . . .) [¶] In short, '[t]here is no question that the statutory rights established by the [Ralph Civil Rights Act and the Tom Bane Civil Rights Act] are "for a public reason." ' (*Armendariz*[ *v. Foundation Health Psychcare Services, Inc.* (2000)] 24 Cal.4th [83,] 100 [99 Cal.Rptr.2d 745, 6 P.3d 669].) Thus, the hate crimes laws constitute unwaivable statutory rights." (*D.C. v. Harvard-Westlake School, supra*, 176 Cal.App.4th at pp. 859–860.)

In *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 111 [80 Cal.Rptr.2d 60], the court noted that ". . . Civil Code section 52.1 must be read in conjunction with Civil Code section 51.7" and said that "the violence or threatened violence must be due to [the] plaintiff's membership in one of the specified classifications set forth in Civil Code section 51.7 or a group similarly protected by constitution or statute from hate crimes." In *Knapps v. City of Oakland* (N.D.Cal. 2009) 647 F.Supp.2d 1129, 1167–1168, which involved claims by an African-American person for police battery and false imprisonment, the court denied relief under a section 51.7 claim, stating "there is insufficient evidence to establish that the officers acted with racial animus. Although [the] [p]laintiff is African-American, he points to no specific evidence showing that the officers' actions on the night of the incident were based on his race."

Plaintiff observes that the courts in *Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441 [39 Cal.Rptr.3d 706] (*Stamps*) and *Winarto v. Toshiba America Electronics Components* (9th Cir. 2001) 274 F.3d 1276 (*Winarto*) (cited in *Stamps, supra*, 136 Cal.App.4th at p. 1441) indicated that there is no requirement under section 51.7 that the violence be motivated by hate. But in *Winarto*, the court stated, "It is unclear whether the statute requires bias to be the sole motivation, a substantial part of the motivation, or an incidental motivating factor. [Citation.]" (*Winarto, supra*, 274 F.3d at p. 1290, fn. 15), thus suggesting that bias of some kind is required. The court also said, "a reasonable jury could find that [the defendant] was motivated in his violence by gender or national origin animus" (*id.* at p. 1290), also suggesting that bias is a requirement. In *Stamps, supra*, 136 Cal.App.4th at pages 1444 and 1459, the court just held that violations of sections 51.7 and 52.1 could be asserted in the employment context and further stated that "[t]hese statutes were designed to stem the number of hate crimes." (*Id.* at p. 1457.) And, in a later California case, the court said that section 51.7 "is, after all, a 'hate crimes' statute. [Citation.]" (*Ramirez v. Wong* (2010) 188 Cal.App.4th 1480, 1486 [116 Cal.Rptr.3d 412].)

In *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820 [11 Cal.Rptr.3d 692, 87 P.3d 1], the court held that the plaintiffs pleaded a cause of action

under section 52.1[3] for an unreasonable search and seizure even though they did not allege the defendants acted with the intent to discriminate or with discriminatory animus. The court noted that section 52.1 was not limited to individuals protected under section 51.7. (*Venegas v. County of Los Angeles, supra,* 32 Cal.4th at p. 842.) The court said, "We cannot reasonably interpret this language, or the unambiguous language of section 52.1 itself, to restrict the benefits of the section to persons who are actual or perceived members of a protected class." (*Id.* at pp. 842–843.) In a concurring opinion, Justice Baxter wrote, "The Legislature's focused effort to combat discriminatory and pernicious conduct often referred to as hate crimes began with the 1976 enactment of Civil Code section 51.7, commonly referred to as the 'Ralph Civil Rights Act' or the 'Ralph Act.' . . . The obvious purpose of the Ralph Act is to declare unlawful, and civilly actionable, any *acts of violence or intimidation by threats of violence* directed against any individual because of his actual or perceived membership in a minority or similarly protected class." (*Id.* at p. 845 (conc. opn. of Baxter, J.).)

Justice Baxter pointed out that an amendment to section 52.1 permits, in effect, an action for a violation of that section without a showing of discriminatory intent. Justice Baxter said that the language of the amendment that results in this consequence was inadvertent; and he inferred that for a violation of section 51.7, a defendant must act with discriminatory intent. (*Venegas v. County of Los Angeles, supra,* 32 Cal.4th at pp. 849–850 (conc. opn. of Baxter, J.).) The court's holding in *Venegas v. County of Los Angeles* applies to section 52.1 and not section 51.7.

Section 52 provides, inter alia, that any violation of section 51.7 may result, in addition to actual damages, in a civil penalty of $25,000 (which was awarded here); attorney fees (also awarded here); an action by the Attorney General, district attorney or city attorney; a Department of Fair Employment and Housing action claim pursuant to Government Code section 12948; and injunctive relief. Moreover, under section 51.1, in any appellate proceeding

---

[3] Section 52.1, the Tom Bane Civil Rights Act, states: "(a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action . . . in order to protect the peaceable exercise or enjoyment of the right or rights secured. . . . [¶] (b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, [the same] damages [available] under [section 51.7—the Ralph Civil Rights Act], injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured."

arising under section 51.7, briefs or petitions must be served on the state solicitor general. Section 51.7 is a civil rights act, not simply a tort liability act. These remedies and provisions suggest that a violation of section 51.7 requires more than just an act against a person who happens to be in a protected class. Rather, the act must be directed at that person with discriminatory intent or animus.

As the Attorney General has opined, sections 51.7 and 52.1 are related to hate crime provisions of the Penal Code as well as to other statutes providing penalties or remedies for "hate-related acts." (88 Ops.Cal.Atty.Gen. 141, 142, fn. 2 (2005) ["In addition to the laws generally addressed herein [Penal Code, § 422.6 et seq.], other related statutes prohibit or provide enhanced penalties for specific hate-related acts ([Pen. Code,] §§ 190.03; 422.6–422.77; 594.3, 11411–11413), create civil remedies for hate crimes (Civ. Code, §§ 51.7–52.1), permit courts to issue special orders protecting victims of hate crimes and preventing future hate crimes ([Pen. Code,] §§ 422.77–422.93), require the Peace Officers Standards and Training Commission to offer training on hate crimes enforcement ([Pen. Code,] § 13519.6), and require the Department of Justice to collect information and report annually on the statewide incidence of hate crimes ([Pen. Code,] §§ 13020–13023)."].) Penal Code section 422.56 et seq. provides criminal penalties for using force, or the threat of force, intimidating or threatening a person "because of . . . the actual or perceived characteristics . . . listed in subdivision (a) of [Penal Code] Section 422.55" (Pen. Code, § 422.6), which section includes gender. Penal Code section 422.77 makes a violation of section 52.1 a misdemeanor and gives county prosecutors the primary responsibility "for the enforcement of orders issued pursuant to Section 52.1 of the Civil Code." (Pen. Code, § 422.77, subd. (c).) Section 52.1, subdivision (b) specifies that any injunctive relief must note that a violation of an injunction is a crime under Penal Code section 422.77. Section 52.1, subdivision (g) refers to actions brought under section 51.7. Section 52, which in turn is referred to in section 52.1, subdivision (b), provides that acts in violation of, inter alia, section 51.7 are subject to penalties and injunctive relief.

The Attorney General was correct that these hate-related provisions are related and have the same purpose. Thus, with the exception of section 52.1 as discussed above, they should be interpreted similarly. As to hate-related provisions, the Attorney General stated, "If a perpetrator commits a sexual assault wholly or partly because of the victim's gender, a hate crime has not been committed unless the perpetrator also acts upon some animosity or other bias motivation toward the victim's gender." (88 Ops.Cal.Atty.Gen., *supra*, 141.) The Attorney General added, "We conclude that the intentional selection of a victim with a protected characteristic is not alone sufficient, and that

a subjective attitude amounting to 'bias motivation' is an essential element of a hate crime offense." (*Id.* at p. 142.) It follows that this reasoning should apply to section 51.7.

The legislative history of section 51.7 is also helpful. The court in *Stamps v. Superior Court, supra*, 136 Cal.App.4th at page 1446 sets forth some of the history as follows: "The history of section 51.7 indicates the legislation was referred to as the Ralph Civil Rights Act and enacted in 1976 as part of Assembly Bill No. 2986 (1975–1976 Reg. Sess.) (Assembly Bill No. 2986). An Assembly Committee report stated that while there were 'numerous state and federal laws providing for full and equal civil rights protections in employment, housing, and access to public accommodations and facilities,' there was no specific prohibition protecting individuals from 'violence because of their race, religion, color, ancestry, or national origin.' (Assem. Com. on Labor Relations, Analysis of Assem. Bill No. 2986, *supra*, Apr. 20, 1976, p. 1.) The report continues, 'Although it is impossible to estimate the instances of violence against persons in California because of race, color, religion or other factors, there have been enough occurrences such as the one in Taft, California last year where Black college students were threatened with violence and chased out of town to signify a possible need for greater protection of this fundamental right. . . . This measure declares that all persons have a right to be free from violence or threat of violence committed against their persons or property because of race, color, religion, ancestry, national origin, political affiliation, or position in a labor dispute.' (*Ibid.*; see also *Venegas v. County of Los Angeles*[, *supra*,] 32 Cal.4th [at pp.] 845–848 [11 Cal.Rptr.3d 692, 87 P.3d 1] . . . (conc. opn. of Baxter, J.), [describing the historical background of the 'Ralph Civil Rights Act']; *In re Joshua H.* (1993) 13 Cal.App.4th 1734, 1748, fn. 9 [17 Cal.Rptr.2d 291] [referring to section 51.7 as the 'Ralph Civil Rights Act'].)"

The California Assembly Committee on Labor Relations further reported as to Assembly Bill No. 2986 (1975–1976 Reg. Sess.) (which resulted in § 51.7) the following: "Under current law, any person filing a complaint with the [Fair Employment Practices Commission (FEPC)] is precluded from initiating private civil action on the same matter. This restriction on right of action would appear to significantly weaken the deterrent effect this measure would have on acts of violence, particularly in view of the large damages that could be collected in a civil action but not in an FEPC decision. Consideration should be given to allowing both a private civil action for damages and use of FEPC enforcement mechanisms. Additionally, it might be advantageous to require the State Attorney General to bring civil action or intervene in any civil action pursuant to the proposed law and Civil Code Section 51 if he has

reasonable cause to believe any person is being denied their civil rights under those provisions." (Assem. Com. on Labor Relations, Rep. on Assem. Bill No. 2986 (1975–1976 Reg. Sess.) Apr. 6, 1976.)

The Governor's legal affairs secretary in a recommendation to the Governor with regard to the legislation stated, "Since the complexity and expense of civil litigation often prevent persons from seeking existing civil remedies, the Attorney General would be authorized to initiate civil actions against persons or groups he reasonabl[y] believes are involved in the denial of rights created by this bill. [¶] According to the bill's author and attorneys active in civil rights litigation, this bill is needed to deter and provide remedies from violence associated with busing and fair housing. Last year the Taft, California, Black students were forced to leave town because of threats of physical violence. Blacks moving into formerly white neighborhoods reportedly suffer property damage, intimidation, and threats of violence. This appears to be particularly true in rural counties, such as Colusa County, where blacks have suffered property damage and have been forced to give up residence due to violence and threats of violence. [¶] Proponents of this measure believe it is needed to promote the fundamental belief that violence and threats of violence should not be allowed to prevent the exercise of constitutionally protected rights." (Legal Affairs Secretary, Enrolled Bill Rep. on Assem. Bill No. 2986 (1975–1976 Reg. Sess.) Sept. 22, 1976.) Senator Ralph, the author of the legislation, referred to the incident in Taft and stated, "AB 2986 provides the State of California with an opportunity to write into the California Codes badly needed Civil Rights legislation." (Assemblyman Leon Ralph, letter to Govenor Edmund G. Brown, Jr., on Assem. Bill No. 2986, Sept. 13, 1976.) The category of "sex" was included as a protected characteristic.

In an analysis for the Assembly in connection with the authority of the Fair Employment Practices Commission, it is stated, "Why are not [sic] current criminal statutes and civil causes of action for violation of person and property not sufficient to cover violence directed at someone for a specific reason? [¶] Rape can be considered a crime perpetrated against someone because of her sex. It seems ridiculous to give FEPC civil rights authority over rape charges. This aspect of the crime was never considered by Criminal Justice Committee." (3d reading analysis of Assem. Bill No. 2986 (1975–1976 Reg. Sess.) May 25, 1976.) From the material I reviewed, these questions were not explicitly addressed. There were other concerns expressed because the wrong to be addressed was already covered by provisions in the Civil and Penal Codes. (Division of Fair Employment Practices, Enrolled Bill Rep. on Assem. Bill No. 2986 (1975–1976 Reg. Sess.) recommending a veto, Sept. 1976; Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 2986 (1975–1976 Reg. Sess.) Aug. 16, 1976.)

As noted in the passages quoted above, the legislation was inspired by violence directed at African-American persons because they were African-Americans. To summarize, the law was to strengthen civil rights laws, and as part of a group of statutes dealing with civil rights, it included penalties, the right of prosecutors to maintain actions, the right to complain to the Department of Fair Employment and Housing, and notification to the solicitor general of appellate proceedings. And cases have described section 51.7 as a "hate crime" statute.

To apply this statute to every act of violence or threat of violence in a sexual context that happens to be directed at a particular woman would result in absurd consequences. (See *In re Michele D.* (2002) 29 Cal.4th 600, 606 [128 Cal.Rptr.2d 92, 59 P.3d 164] ["it is settled that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the Legislature did not intend"].) Such a broad application would mean every act or threat of violence in a domestic setting, or every inappropriate touching or assault or harassment directed at a specific woman, could be a violation of section 51.7 and be subject to fines, injunctions, attorney fees, and law enforcement actions.

The statute requires more. It is intended to address violence engendered by a hatred or animus directed at a "characteristic" of race or sex and other protected classes of persons—not an act of violence or intimidation by threat of violence directed at a particular person who happens to be an African-American or a woman or some other protected class member. In this case, there is no evidence that plaintiff's supervisor or other defendants hated or had an animus towards women in general. Indeed, the supervisor had apparently lusted after plaintiff—a woman. Even if some of his acts were committed in anger, the evidence is that it was a defendant's anger directed at one person for being spurned—not anger generated by a bias against or hatred of women.

Accordingly, if section 51.7 applies to any act of violence or intimidation by threat of violence, such application will have the unintended consequence of being included in virtually all cases like this one, and many more, just for recovery of a penalty and attorney fees. Under such an interpretation, section 51.7 could be applied to cases between lovers, spouses, employers and employees, and all violent sexual crimes and torts. Such an application would relegate a civil rights measure to just another remedy for acts already covered by penal and civil statutes rather than for its intended goal of dealing with violent acts motivated by animus towards the "characteristics" specified in the statute.

I would therefore reverse the judgment under section 51.7, as well as the award of attorney fees and penalty thereunder. I concur in the remainder of the judgment.

A petition for a rehearing was denied January 9, 2013. Mosk, J., was of the opinion that the petition should be granted. Appellants' petition for review by the Supreme Court was denied April 10, 2012, S208343.